**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: June 11, 2024

S24A0158.  HARMON v. THE STATE.

PINSON, Justice.

Shanadore Harmon and Jermaz Lawson got into an argument that ended with Harmon shooting into the car that Lawson was driving. The bullet struck and killed Brittany Trantham, who was sitting in the passenger seat. Harmon was convicted of the malice murder of Trantham, the aggravated assault of Lawson, and three firearms offenses.[1]

---

[1] Trantham was shot on October 24, 2015, and died two days later. On January 20, 2016, a Richmond County grand jury returned an indictment charging Harmon with malice murder of Trantham (Count 1), felony murder of Trantham predicated on aggravated assault (Count 2), two counts of possession of a firearm during the commission of a crime (Counts 3, 5), aggravated assault of Lawson (Count 4), and possession of a firearm by a convicted felon (Count 6). At a jury trial from May 7 to 9, 2018, the jury returned guilty verdicts on all counts. On May 10, 2018, the trial court entered a sentence of life without the possibility of parole for malice murder (Count 1), consecutive sentences of five years for each of the firearm convictions (Counts 3, 5, 6), and a

On appeal, Harmon contends that the evidence was not constitutionally sufficient to convict him of Trantham's murder or the related firearms offenses, the trial court erred by denying his motion for directed verdict on the aggravated assault and firearm offense related to Lawson, and he received constitutionally ineffective assistance of counsel because his trial counsel did not raise a hearsay objection to the admission of Lawson's recorded statement to police. Each claim fails. The evidence, recounted below, was sufficient to support each of Harmon's convictions related to the murder of Trantham and the denial of his motion for directed verdict on the counts related to the assault of Lawson. Harmon also failed to establish that he was prejudiced by counsel's failure to object to the admission of Lawson's statement to police, because even putting this statement

_____

consecutive sentence of twenty years for aggravated assault (Count 4).The felony murder count (Count 2) was vacated by operation of law. New counsel for Harmon entered an appearance and timely filed a motion for new trial; Harmon changed counsel and filed amendments to that motion several times. After a hearing on June 27, 2022, the trial court denied Harmon's motion for new trial, as amended, on June 30, 2022.Harmon timely filed a notice of appeal on July 14, 2022.His appeal was docketed to the term of court beginning in December 2023 and submitted for a decision on the briefs.

aside, the convictions were supported by strong evidence, including testimony from two witnesses who saw Harmon stand behind Trantham's car (which Lawson was driving) and then heard gunshots, as well as evidence that Harmon was found soon after the shooting with the gun that fired both the fatal bullet and all the bullets collected from the crime scene. So we affirm Harmon's convictions and sentence.

1. The evidence at trial showed the following.[2]

On the night of October 24, 2015, Harmon, Lawson, Trantham, and others went to the Limelite Café in Richmond County, where Harmon and Lawson got into an argument. Their argument got so "heated" that security told their group to leave. Lawson left with Trantham and drove her car, Harmon left in another car, and their group eventually met near Lawson's grandmother's home on Cunningham Drive.

---

[2] Because this case involves a question of prejudice under *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984), we recount the trial evidence in some detail, weighing the evidence as we would expect reasonable jurors to have done rather than only in the light most favorable to the verdict. See *Wood v. State*, 316 Ga. 811, 812 (1) n.2 (890 SE2d 716) (2023).

Trantham remained in the passenger seat of the parked car the whole time she and Lawson were at Cunningham Drive that night. Lawson, however, got out of the car, and he and Harmon resumed their argument. Harmon pulled out a gun and was "waving it around" during the argument, and the argument eventually escalated into a fistfight.

Tammy Lawson, who was related to both Harmon and Lawson, testified at trial that she was asleep at the Cunningham Drive home and woke up when she heard arguing. She looked outside and saw that Lawson and Harmon were arguing, and that Harmon had a gun. She saw "a couple people" other than Harmon with guns but did not think Lawson had one. Tammy went outside and told Lawson to leave. He left, but came back less than five minutes later and resumed arguing with Harmon.

Tammy testified at trial that she did not see Harmon fire the gun, but she said that "[h]e was waving it around then he fired it." In interviews recorded with police on the night of the shooting, Tammy first told police that she woke up to loud music, heard two

gunshots, and went to the door and saw two cars driving by at a fast speed. But once she and the officer resumed the interview outside the presence of other family members, she told police the same version of events she testified to at trial: that, while Harmon and Lawson were arguing, she saw Harmon walk to the back of Trantham's car (which Lawson was driving) and "heard" him "fire" two shots. In another interview recorded at the police station later that night, Tammy told police that Harmon shot at the car twice and appeared to be aiming for the trunk.

Lawson testified that he was standing by the driver's side door of the car when he heard gunshots from behind him, and he then got into the car and drove away.

As Lawson drove toward home, he tried to get Trantham's attention, nudged her, and discovered that she was bleeding and unresponsive. He immediately drove her to the hospital, where doctors determined that Trantham's wounds were fatal and placed her on life support until her organs could be donated. She died two days later.

Lawson spoke to police about the shooting twice: first after bringing Trantham to the hospital, and again later that morning at the police station. In the police station interview, Lawson said that the night before, he and Harmon had been "talking trash" at Limelite. Later, he and Trantham left Limelite and went back to his grandmother's home on Cunningham Drive. Harmon was already there and stood outside Lawson's front passenger door with a pistol when Lawson got out of the car. Harmon's pistol fell, and Harmon picked it up and put it in his waistband. Harmon then "swung" at Lawson, and Lawson fought back. During the fight, Harmon pulled his pistol out more than once. Eventually, someone told Lawson he needed to leave, and he did. Harmon "started shooting" and Lawson heard two gunshots while he was still outside of the car and a third shot as he was driving away. He drove toward home and, when he tried to get Trantham's attention, her head fell to the side, and he saw blood, so he drove her to the hospital.

Meanwhile, back at Cunningham Drive, Tammy saw Harmon "walk[ ] up the street" as Lawson drove away. A sheriff's deputy,

responding to a report of shots fired on Cunningham Drive, saw a man duck behind a tree, so he stopped, and he found Harmon on his hands and knees under the tree with a pistol. The officer took a Smith & Wesson 9-millimeter pistol from Harmon and detained him.

After investigators connected the report of shots fired on Cunningham Drive with Trantham's shooting, Harmon's hands were swabbed for gunshot residue and his clothes were collected and tested for gunshot residue. No gunshot residue was detected on the swabs from his hands and one particle characteristic of gunshot residue was found on his shirt.

The autopsy and other forensic evidence showed that a bullet passed through the back window of the car Trantham had been sitting in, into the headrest of her seat, and through her neck, where the bullet severed her spinal cord and lodged in her tongue. The medical examiner testified that this gunshot wound was the sole cause of Trantham's death, and the fatal bullet was removed from her tongue and submitted to the GBI for testing. That bullet, as well

as shell casings found at Cunningham Drive, were matched to the firearm police found Harmon with when he was detained soon after the shooting. The firearms expert also concluded that a bullet found in the spare tire of Trantham's car was consistent with being fired from the same type of firearm, but she could not determine if the bullet was fired from Harmon's specific gun because the bullet was damaged.

2. Harmon contends that the evidence was not sufficient to support his convictions for malice murder, possession of a firearm during that crime, and possession of a firearm by a convicted felon because the evidence did not show beyond a reasonable doubt that Harmon, and not Lawson or someone else, fired the fatal shot. Harmon also contends that the trial court erred in denying his motion for a directed verdict as to the aggravated assault against Lawson and possession of a firearm during the commission of that crime because there was no evidence that Lawson was ever in fear of being shot.

(a) We evaluate a due process challenge to the sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict. See *Lee v. State*, 318 Ga. 412, 415 (2) (a) (897 SE2d 856) (2024) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979)). Viewing the evidence in that light, we determine whether any rational trier of fact could have found beyond a reasonable doubt that the defendant was guilty of the crimes of which he was convicted. See *Lee*, 318 Ga. at 415 (2) (a). In doing so, "we leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts." Id. at 415-416 (2) (a) (citation and punctuation omitted).

Applying that standard here, the evidence summarized above and viewed in the proper light was sufficient for a rational trier of fact to find Harmon guilty of each of the offenses he was convicted of. As to malice murder, both Lawson and Tammy saw Harmon with a gun when he was arguing with Lawson and heard gunshots while Harmon stood behind Trantham's car. Tammy also saw Harmon

9

shoot at the back of the car where Trantham sat.[3] And, soon after the shooting, police found Harmon hiding behind a tree nearby with the gun that fired the fatal bullet, and forensic testing showed that all the shell casings and bullets collected during the investigation were or may have been fired from that same gun. See *Morris v. State*, 317 Ga. 87, 92-93 (2) (891 SE2d 859) (2023) (affirming malice murder conviction where the evidence authorized the jury to conclude that the defendant fired the fatal bullet, as the evidence showed he possessed at least two guns on the night of the shooting, including one from which the fatal bullet could have been fired, and his act of shooting at the victim's van was the proximate cause of the victim's

---

[3] Harmon contends that he was not the shooter and does not specifically address the element of malice. Although there is little evidence that Harmon intended to shoot and kill Trantham, there is ample evidence that he intended to shoot and kill Lawson, including their argument at the café earlier that night, their physical altercation at Cunningham Drive, and evidence that Harmon shot at the car as Lawson entered it. Under the doctrine of transferred intent, a person who intends to, for example, shoot one person and unintentionally strikes another cannot avoid wrongdoing by claiming that he did not intend to shoot *that* victim; his intent is transferred from the person he intended to shoot to the person whom he actually shot. See *Smith v. State*, 315 Ga. 357, 364-365 (4) (882 SE2d 289) (2022). So the element of malice is supported by the evidence that Harmon intended to shoot and kill Lawson, and that intent was transferred to Trantham, whom Harmon actually shot. Id.

death).

This evidence was also sufficient to support Harmon's conviction for possession of a firearm during the commission of malice murder. See *Hill v. State*, 276 Ga. 220, 221 (3) (576 SE2d 886) (2003) ("Evidence that the defendant . . . carried or was within arm's length of a weapon during the commission of a crime authorizes a finding of guilt" for possessing a firearm during the commission of a crime). Combined with the evidence of Harmon's three earlier felony convictions,[4] this evidence also supported the conviction for possession of a firearm by a convicted felon. See *Walker v. State*, 281 Ga. 157, 165 (10) (c) (635 SE2d 740) (2006) (certified copies of prior felony conviction combined with evidence supporting convictions for malice murder and possession of a firearm during commission of a crime were sufficient to support conviction for possession of a firearm by a convicted felon).

(b) The standard for review of the constitutional sufficiency of

---

[4] The State introduced certified copies of Harmon's three prior felony convictions, which were admitted into evidence during the bifurcated portion of the trial.

11

the evidence also governs our review of the denial of a motion for a directed verdict. See *Rashad v. State*, 318 Ga. 199, 206 (2) (897 SE2d 760) (2024).

To convict someone of aggravated assault (or deny them a directed verdict on that count), as relevant here, the State must prove beyond a reasonable doubt that the defendant used a deadly weapon "to commit an act which places another person in reasonable apprehension of immediately receiving a violent injury." *Jackson v. State*, 315 Ga. 543, 549 (1) (a) (883 SE2d 815) (2023) (citation omitted). See OCGA §§ 16-5-20, 16-5-21. Whether the victim was placed "in reasonable apprehension of injury" is a question of fact, and "[t]he presence of a deadly weapon would normally place a victim in reasonable apprehension of being injured violently." *Jackson*, 315 Ga. at 549 (1) (a) (quoting *Stewart v. State*, 299 Ga. 622, 626 (2) (a) (791 SE2d 61) (2016)).

The evidence at trial authorized the jury to conclude beyond a reasonable doubt that Lawson was placed in reasonable apprehen-

sion of receiving a violent injury when he heard gunshots from behind him after seeing Harmon with a gun. See id. This, combined with the evidence that Harmon was the shooter, which we discussed in Division 2 (a), was sufficient to support the denial of a motion for directed verdict on the aggravated assault count and, ultimately, to support Harmon's conviction for that crime. See e.g., *Gobert v. State*, 311 Ga. 305, 309-310 (1) (b) (857 SE2d 647) (2021) (sufficient evidence to support an aggravated assault conviction where there was evidence that the defendant fired multiple shots into the car where the victim was riding); *Pyatt v. State*, 298 Ga. 742, 742-743 & n.1, 744-745 (1) (784 SE2d 759) (2016) (sufficient evidence to support aggravated assault convictions where defendant and others shot into the car where the victims were riding). This evidence was also sufficient to support the denial of a motion for directed verdict on, and a conviction for, possession of a firearm during the commission of the aggravated assault. See *Hill*, 276 Ga. at 221 (3).

3. Harmon contends that his trial counsel provided constitutionally ineffective assistance by failing to object to the admission of

Lawson's police statement. He asserts that Lawson's police statement was hearsay that did not fall within any exception, and he was prejudiced by its admission because the statement served only to improperly bolster Lawson's and Tammy's trial testimony.[5]

To succeed on a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance both was deficient (objectively unreasonable under the circumstances) and caused him prejudice (shown by establishing a reasonable probability that the result of the trial would have been different absent counsel's deficient performance). See *Lee*, 318 Ga. at 420 (6) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984); *Scott v. State*, 317 Ga. 218, 221 (2) (892 SE2d 744) (2023)).

---

[5] Harmon also takes issue with the wording of several questions the State asked Lawson on cross-examination about whether Lawson told police that he saw Harmon fire the gun (which Lawson denied saying). Harmon contends that the State asked these questions to "mislead" the court into admitting the challenged recording of Lawson's interview with police as a prior inconsistent statement. But Harmon does not appear to claim that trial counsel was ineffective for not objecting to these questions. In any event, for the reasons we discuss later in this opinion, Harmon has not shown that he was prejudiced by the admission of Lawson's police interview, during which Lawson told police he saw Harmon with a gun and later heard gunshots but did not say he saw Harmon fire the gun.

When evaluating whether an appellant has established prejudice under *Strickland*, "we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done" rather than in the light most favorable to the verdict. See *Wood v. State*, 316 Ga. 811, 812 (1) n.2 (890 SE2d 716) (2023) (quoting *Draughn v. State*, 311 Ga. 378, 382-383 (2) (b) (858 SE2d 8) (2021)).

Even assuming that trial counsel performed deficiently by failing to object to the admission of Lawson's statement to police, Harmon has not established that he was prejudiced by that failure. See *Lee*, 318 Ga. at 420 (6). Even without Lawson's statement to the police, the evidence against Harmon was still very strong. Lawson testified that he saw Harmon with a gun when they were arguing and, even though he did not see Harmon fire the gun, he heard gunshots from behind as he entered the driver's side of the car. Tammy also testified that immediately before shots were fired, she saw Harmon with a gun and saw him walk to the back of Trantham's car as Lawson entered the driver's seat. Although it is unclear whether Tammy

only heard the gunshots or also saw them,[6] her testimony—that Harmon had a gun and was standing behind Trantham's car when gunshots rang out—was largely consistent with Lawson's testimony. Their testimony about the shooting was further supported by evidence that police found Harmon hiding near the crime scene with a gun soon after the shooting, and forensic evidence that the fatal bullet, and all the bullets and shell casings collected at the crime scene, matched Harmon's gun. Given this evidence, Harmon has not established a reasonable probability of a different result absent trial counsel's assumed error of not objecting to the admission of Lawson's statement to police.[7] See *Henderson v. State*, 304 Ga. 733, 738 (3) (d)

---

[6] Tammy testified that she did not see Harmon fire the gun but saw him "waving it around then he fired it." But she told police during her third interview on the night of the shooting that Harmon shot at the car twice and appeared to be aiming for the trunk.

[7] A word about preserved hearsay objections to the admission of prior statements to police that were "consistent" with the speaker's trial testimony but were not "prior consistent statements" within the meaning of the Evidence Code. We have evaluated whether admitting such statements was harmless error by disregarding both the inadmissible hearsay statement and the trial testimony that the improperly admitted hearsay statement repeated, and then applying the standard for non-constitutional harmless error. See, e.g., *Allen v. State*, 315 Ga. 524, 535 (5) (883 SE2d 746) (2023); *McGarity v. State*, 311 Ga. 158, 167-168 (3) (856 SE2d 241) (2021); *Davis v. State*, 307 Ga. 746, 751 (2) (b)

(822 SE2d 228) (2018) (concluding that defendant failed to establish *Strickland* prejudice from counsel's failure to object to hearsay because, given the strong evidence against him, he failed to show that there was a reasonable probability that the outcome of the trial would have been different if the jury had not heard the hearsay). See

---

(838 SE2d 263) (2020) (decided under the old Evidence Code). We have explained that whether admitting the hearsay statement was harmless error depends on whether it is "highly probable that the error did not contribute to the jury's guilty verdict," so we do not "look to [the witness's] improperly bolstered testimony to show that the bolstering error was harmless." *Cowart v. State*, 294 Ga. 333, 341-342 (4) (b) (751 SE2d 399) (2013) (citation and punctuation omitted). In doing so, we may have conflated the improper admission of hearsay statements that repeated the live witness's testimony with "bolstering"— a term that more precisely describes the scenario of one witness vouching for the credibility of the other. See *Brown v. State*, 302 Ga. 454, 460-461 (2) (b) (807 SE2d 369) (2017) ("When a witness's statement does not directly address the credibility of another witness...there is no improper bolstering."). But we need not decide here whether this approach is correct, because Harmon's argument about admitting this prior statement is made as part of an ineffective assistance claim under *Strickland*. Under *Strickland*'s prejudice standard, we ask if the defendant has established a "reasonable probability" that the result of the trial would have been different absent counsel's deficient performance. See *Strickland*, 466 U.S. at 694 (III) (b). Here, had Harmon's counsel raised a hearsay objection when the State moved to admit Lawson's police interview and the objection were sustained, the jury would not have heard Lawson's police interview. But the jury still would have heard Lawson's and Tammy's live testimony and the evidence that Harmon was found with the gun that matched all the bullets at the crime scene, all of which, as discussed above, was very strong evidence of his guilt.

also *Wood*, 316 Ga. at 812 (1) n.2; *Morris*, 317 Ga. at 92-93 (2); *Gobert*, 311 Ga. at 309 (1) (a); *Pyatt*, 298 Ga. at 742-743 & n.1, 744-745 (1); *Walker*, 281 Ga. at 165 (10) (c).

*Judgment affirmed. All the Justices concur.*